**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MARY LOU GONZALES,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN JOSE, et al.,<br><br>Defendants. | Case No.  13-cv-00695-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Re:  ECF 140, 146] |

On February 13, 2012, police officers from the San Jose Police Department mistakenly arrested plaintiff Marylou Gonzales ("Plaintiff") at her house at 425 Matthews Court in Milpitas. The police officers were investigating a recent homicide and went to the house to talk to the suspect's mother.  After knocking on the door, the woman who opened the door appeared to the officers to fit the description of a woman named "Mary Gonzales" whom they knew to be the subject of a felony arrest warrant.  The officers pushed the woman into the house, handcuffed her, and conducted a protective sweep of the house.  After completing the sweep and reviewing her identification, the officers realized that the woman they had arrested—Plaintiff in this case—was not the Mary Gonzales named in the arrest warrant.  They released her and left, but not before questioning her about her son's whereabouts and asking her to contact the detective in charge of the homicide investigation.  In connection with that intrusion, Plaintiff brought federal and state civil rights claims against San Jose Police Sergeant Matthew Archer, Officers Yvonne DeLa Cruz, Stephen Fries, Casey Higgins, Michael Pifferini, and Ruben Sanchez, Detective Jaime Jimenez, former San Jose Police Chief Chris Moore, as well as the City of San Jose ("City") (collectively with all other named defendants, "Defendants").

United States District Court
Northern District of California

Before the Court are two motions for summary judgment: (1) a motion for partial summary judgment filed by Plaintiff and (2) a motion for complete summary judgment filed by all defendants in the case.  The Court heard oral argument on April 2, 2015 and thereafter deemed the matter submitted.  On May 15, 2015, the parties stipulated to dismiss all of Plaintiff's claims against Officers Fries, Higgins, Pifferini, and Sanchez, Detective Jimenez, and former Chief Moore.  Stipulation, ECF 181.  The parties further stipulated to dismiss Plaintiff's first, third (partial), seventh, and eighth causes of action against the remaining parties.  This order accordingly addresses the parties' respective arguments only in regards to the remaining defendants and claims.  After careful consideration, the Court hereby DENIES Plaintiff's Motion for Partial Summary Judgment and GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment on the remaining claims.

## I.   BACKGROUND

The events underlying this lawsuit occurred in connection with the San Jose Police Department's investigation into the February 5, 2012 shooting death of Ramon Ruano.  San Jose Police Sergeant Stewart Davies and Detective Jaime Jimenez oversaw the investigation.  Pl.'s Request for Judicial Notice ("RJN"), ECF 145, Exh. A.  The police suspected that the shooting was gang-related and, within the first week of the investigation, had identified two suspects: Michael Torres and his roommate, Robert Cordova, Jr.  *Id.* at SJ000445; Decl. of Ardell Johnson, ECF 142 Exh. F (Jimenez Dep. Pt. 1) 17:16-18:1. Robert Cordova, Jr. is Plaintiff Marylou Gonzales's son.

### A.   Surveillance on Robert Cordova

Sergeant Archer and Officers DeLa Cruz, Fries, Higgins, Pifferini, and Sanchez, along with Officer Tony Ruelas (who is not named in this lawsuit) were members of Metro Team 1 assigned to assist the detectives in their investigation.  On February 7, 2012, members of Metro Team 1 performed surveillance on an apartment at 4362 Moorpark Avenue in San Jose, where Torres and Cordova were known to reside.  Officer Higgins observed a Toyota Camry drive up to the Moorpark apartment, the female driver of the car exit and knock on the door of the apartment, and, when there was no answer, return to the car and drive away.  Higgins noted the license plate

2

1    number and reported it, along with a description of the driver and of the car, over the air to his

2    team members.  Johnson Decl. Exh. C (Fries Dep. Pt. 1) 53:9-20; *id.* Exh. A (Archer Dep. Pt. 1)

3    88:7-18.  Officer Sanchez ran the license plate number through a mobile display terminal in his car

4    and determined that the car was registered to a "Marylou Gonzales" at 425 Matthews Court in

5    Milpitas.  Sanchez also determined, by running the name through a separate database, that there

6    was an outstanding felony warrant for "Mary Gonzales."  Fries Dep. Pt. 1, 54:3, 56:2-10; Archer

7    Dep. Pt. 1, 91:3-92:3.  Officers Sanchez and Fries pulled up a mugshot for "Mary Gonzales" and

8    followed the Toyota Camry to attempt to get a glimpse of the driver.  Officer Fries testified that he

9    observed the driver and determined based upon her hair color and overall body size that she

10   looked "[s]imilar to the girl that we were looking at in the mug picture."  Fries Dep. Pt. 1, 57:22-

11   65:18.  Fries reported this to the rest of the team.  Johnson Decl. Exh. B (DeLa Cruz Dep. Pt. 1)

12   70:4-10, 75:9-76:8.

13        It is undisputed that the warrant for Mary Gonzales does not pertain to Plaintiff.  "Mary

14   Gonzales" appears to be an alias for Mary Martinez, who also went by "Maryann Gonzales."

15   There is no dispute that the outstanding warrant that the officers located was for this other Mary

16   Gonzales and that the warrant was facially valid.  *See* Pl.'s RJN Exh. B (arrest warrant for "Mary

17   Gonzales" issued by Santa Clara County Superior Court and signed October 10, 2011).  In the

18   interest of clarity, and to avoid any confusion, the Court hereinafter refers to Plaintiff as

19   "Marylou" and to the subject of the arrest warrant as "Maryann."

20        As part of the homicide investigation, Officer DeLa Cruz relayed all of this surveillance

21   information to Detective Jimenez in a February 7, 2012 email.  The email indicates that the

22   registered owner of the Toyota Camry was "Marylou Gonzales" with an address at 425 Matthews

23   Court that was known to be Cordova's Milpitas address.  Officer Fries "located a female named

24   Maryann Gonzales," and point Officers Higgins and Mattocks "positively ID'[d] the photograph

25   associated to the PFN as the same female that knocked on the target door."  DeLa Cruz also noted

26   that there was an outstanding warrant for Maryann.  Decl. of Steven M. Berki, ECF 146-3 Exh. A.

27   A probable cause statement signed by Sergeant Stewart Davies on February 9, 2012 in support of

28   a search warrant for Cordova's Moorpark apartment indicates that "[a]dditional police records

United States District Court
Northern District of California

3

1  checks revealed that Marylou Gonzales was the mother of Robert Cordova, Jr." Pl.'s RJN Exh. A

2  at SJ000445. It is not clear whether this latter information was shared with Metro Team 1.

3  **B.   Metro Team 1 Prepares to Contact Cordova's Mother**

4  Several days later, on February 13, 2012, Cordova was still at large and Detective Jimenez

5  asked Metro Team 1 to contact Cordova's mother. In preparation, the Metro Team 1 members

6  met to review the "intelligence" they had on Plaintiff's house at 425 Matthews Court. Officer

7  DeLa Cruz provided background information on Cordova, including the existence of an

8  outstanding warrant for his arrest and the gang he was associated with at the time. Decl. of M.

9  Jeffrey Kallis, ECF 160 Exh. A (Archer Dep. Pt. 2) 125:11-126:4. The felony arrest warrant for

10  Maryann was mentioned as intelligence on the house because a car registered to that address had

11  previously been spotted at Cordova's Moorpark address, and the officers had connected Maryann

12  to the driver of the car. Archer Dep. Pt. 1, 126:5-17; DeLa Cruz Dep. Pt. 1, 117:6-12, 217:11-19.

13  Archer, DeLa Cruz, and Ruelas all recall reviewing a photograph of Maryann. Archer Dep. Pt. 1,

14  126:12-22; DeLa Cruz Dep. Pt. 1, 125:16-126:1; Johnson Decl. Exh. H (Ruelas Dep. Pt. 1) 35:18-

15  22, 51:11-52:16. Moreover, the Toyota Camry previously observed at the Moorpark apartment

16  was parked in the driveway of the house at 425 Matthews Court. Archer Dep. Pt. 1, 144:22-145:7;

17  DeLa Cruz Dep. Pt. 1, 143:16-144:7; Ruelas Dep. Pt. 1, 51:20-52:4.

18  The officers also discussed prior surveillance on 425 Matthews Court conducted by a

19  different unit—the CRU. Sergeant Archer knew that by February 13, the CRU was no longer

20  watching the house. Because that unit was the "primary apprehension team," the fact that the

21  CRU had discontinued surveillance informed him that Robert Cordova was unlikely to be at 425

22  Matthews Court. Archer Dep. Pt. 1, 110:9-17. Officer DeLa Cruz testified similarly that the CRU

23  had determined that Cordova was not at the house but noted that when her team arrived at 425

24  Matthews Court on February 13, they observed a car that she knew to be associated with Cordova

25  from a prior investigation she had conducted with the gang unit. DeLa Cruz Dep. Pt. 1, 83:13-24,

26  217:11-218:14. DeLa Cruz informed her team and, based upon that observation, believed there

27  was a "remote possibility" that Cordova was at the house. *Id.* Sergeant Archer thought that

28  Cordova's car "looked like it had been sitting there awhile." Archer Dep. Pt. 1, 149:14-20.

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1   The officers' purpose for visiting the house is unclear.  Officer DeLa Cruz testified that

2   their sole purpose was to contact witnesses to bring to the police department for interview, and

3   that it was not their purpose "to go after Robert Cordova" or "to go after Maryann Gonzales [ ]

4   who had a felony warrant."  *See* DeLa Cruz Dep. Pt. 1, 143:2-15, 190:15-17.  She admits,

5   however, that a police report she wrote after the incident indicates that the team also went to 425

6   Matthews Court for an "ATL of a female wanted for a felony."  Kallis Decl. Exh. B (DeLa Cruz

7   Dep. Pt. 2) 85:12-87:20.  Officer Pifferini testified that the team went to the house because "I

8   believe we were trying to locate the [suspect]."  Kallis Decl. Exh. D. (Pifferini Dep. Pt. 2), 13:7-

9   16.  Sergeant Davies—Detective Jimenez's partner in the investigation—testified that "Metro

10  went [to 425 Matthews Court] looking for [Cordova]" because that was his "address of record."

11  Kallis Decl. Exh. G (Davies Dep.) 49:9-16.

12  **C.    The Arrest of Marylou Gonzales**

13  Following their staging meeting, Metro Team 1 proceeded to 425 Matthews Court to make

14  contact.  It is unclear exactly how many officers were present, although at least six recall being

15  there.  Officer Pifferini was assigned to the exterior of the house to watch "the fence line."

16  Johnson Decl. Exh. G (Pifferini Dep. Pt. 1) 15:11-23.  Similarly, Officer Fries watched the front

17  window "[i]n case someone jumped out."  Berki Decl. Exh. D (Fries Dep. Pt. 3) 79:5-11.  Officer

18  Sanchez likewise recalls being on the outside of the house.  Johnson Decl. Exh. I (Sanchez Dep.

19  Pt. 1) 15:22-24.  Sergeant Archer had also requested additional resources from Metro Team 2 to

20  establish an "outer perimeter" because "in the event that Mr. Cordova was actually there, we

21  would need actual units in the area to assist."  Archer Dep. Pt. 1, 112:8-10, 113:4-8.

22  It is undisputed that only Sergeant Archer and Officers DeLa Cruz and Ruelas went to the

23  front door of the house.  Upon their knock, a woman answered the door.  To Officer Ruelas, she

24  was a "Hispanic female probably in her 40s" who appeared "agitated."  Ruelas Dep. Pt. 1, 33:19-

25  25.  DeLa Cruz indicated that the woman was "argumentative" and "uncooperative."  DeLa Cruz

26  Dep. Pt. 1, 128:18-129:5.  That woman was Plaintiff Marylou Gonzales.

27  Within ten seconds of Plaintiff opening the front door, at least one officer—possibly two—

28  verbally articulated a "positive ID."  All three officers assert that they identified the woman at the

5

door to be the Maryann Gonzales described in the outstanding felony arrest warrant—the woman whose picture they had seen in their staging meeting.  Archer Dep. Pt. 1, 149:1-4; DeLa Cruz Dep. Pt. 1, 125:11-126:1, 132:6-24; Ruelas Dep. Pt. 1, 46:21-47:2.  Furthermore, DeLa Cruz recalls seeing that Plaintiff matched Maryann's physical description ("Short, heavy-set Hispanic female") and recalls seeing a mark on Plaintiff's face that DeLa Cruz believed to be consistent with the mugshot of Maryann, which showed a mole on Maryann's face.  DeLa Cruz Dep. Pt. 1, 191:14-25; *see also* Berki Decl. Exh. C (DeLa Cruz Dep. Pt. 3), 194:8-25.  Archer verbalized the "positive ID."  Archer Dep. Pt. 1, 145:9-10; DeLa Cruz Dep. Pt. 1, 132:10-24; Ruelas Dep. Pt. 1, 47:14-17 (testifying that he recalled both Archer and DeLa Cruz verbalizing a positive ID).[1]

The officers pushed Plaintiff into the house, handcuffed her, and sat her on the couch in the living room.  Johnson Decl. Exh. D (Gonzales Dep. Pt. 1) 74:2-14, 78:14-79:21.  Plaintiff recalls one officer (a "short Hispanic man") yelling "Maryanne – Maryanne, Marilyn Gonzales, there's a felony warrant for your arrest.  You're going to jail."  *Id.* 74:6-12; *see also id.* 77:22-78:4.

### D.   The Sweep of Marylou Gonzales's House

Once Plaintiff was in handcuffs, Sergeant Archer called for a protective sweep of the house.  Archer Dep. Pt. 1, 145:9-20.  Archer and DeLa Cruz both believed the sweep was warranted because of the possibility that Cordova could be in the house.  *Id.*; DeLa Cruz Dep. Pt. 1, 217:11-218:14.  As many as seven or eight officers conducted a quick search of the house—four or five with their guns drawn—while Plaintiff remained in handcuffs on the couch.  Gonzales Dep. Pt. 1, 79:15-21, 80:10-12, 22-24.  The search was completed in about thirty seconds.  *Id.* 79:18-19.  Plaintiff's niece and younger children, who were in the house at the time, were ushered into the living room.  Kallis Decl. Exh. F (Ruelas Dep. Pt. 2) 39:15-40:2.

It is not clear which of the Officer Defendants participated in the sweep.  Sergeant Archer and Officer Ruelas both admit to participating in the sweep.  Officer Ruelas believed that there

---

[1] Officer Ruelas explained in his deposition that he also determined that Plaintiff was Maryann based upon his own observation but that he did not articulate the "positive ID" because is used as a term of art: "When we use the term 'positive ID,' that means we actually verbally say 'positive ID' which then that's the person that we refer to as the one that actually made the identification." Ruelas Dep. Pt. 1, 47:10-13.

must have been at least one other officer in the house. *Id.* 38:18-39:5. Neither Officers Sanchez nor Pifferini recall entering the house. Sanchez Dep. Pt. 1, 15:22-24; Pifferini Dep. Pt. 1, 15:11-23. Officer Fries testified that he "eventually" entered the house after Sergeant Archer and Officer DeLa Cruz had entered. Fries Dep. Pt. 1, 82:2-19. When he observed, upon entering the house, that "everybody was seated on a couch" and that "the house was secure," he went back outside to stand with Officer Sanchez. *Id.* 82:22-83:7. Fries furthermore testified that he was not inside of the house when the protective sweep was conducted. *Id.* 85:21-24. Officer Higgins he did not participate in the events of February 13, 2012 and was not even present at Plaintiff's house on that day. Johnson Decl. Exh. E (Higgins Dep.) 24:15-24. This testimony is uncontroverted. Furthermore, it is undisputed that Detective Jimenez was not present at the scene.

### E.    The Police Realize Their Mistake

During and after the sweep, Officer DeLa Cruz attempted to explain to Plaintiff the reason for her arrest. Plaintiff recalls conversing with DeLa Cruz: "She kept saying that I was Maryann Gonzales and I was Mary Lou – I mean Maryann and Marilyn were the names she gave me and she asked me if I had a sister because she said that I looked just like the Marilyn and Maryann Gonzales." Gonzales Dep. Pt. 1, 82:2-6. Plaintiff denied that she was Maryann and DeLa Cruz continued to attempt to speak to her about the arrest warrant.

It is unclear when and how the officers finally determined that Plaintiff was not Maryann. Plaintiff recalls the "short Hispanic officer" comparing her face to a picture on his phone and asking the other officers it if looked like her. *Id.* 79:24-80:8. At some point, the officers also noted that Plaintiff had a mole on her face, but that it was on the wrong side of the face. *Id.* 83:10-12. Eventually, Officer DeLa Cruz obtained Plaintiff's ID and ran her name through dispatch. She was then able to confirm that there were no outstanding warrants for Plaintiff. DeLa Cruz Dep. Pt. 3, 155:4-16. Once DeLa Cruz confirmed that Plaintiff was not Maryann, her handcuffs were removed. Ruelas Dep. Pt. 1, 42:11-12. At some point, Officer DeLa Cruz explained to Plaintiff: "'Let me tell you the real reason why we're here.' She said, 'There's been a homicide. And somebody that address comes back here may be involved or may know something about this.'" Gonzales Dep. Pt. 1, 82:24-83:2. DeLa Cruz also stated: "'I can guarantee you somebody

1  looks just like you has a warrant and issues in your address.  You better go check it out.'"  *Id.*

2  87:2-4.  However, Plaintiff was understandably upset and angry, despite the officers' attempts to

3  explain the mistake.  *Id.* 42:11-17, 87:18; DeLa Cruz Dep. Pt. 1, 157:5-12.  The officers left

4  contact information for Detective Jimenez and left Plaintiff's house.

5        The entire episode lasted "10 minutes or 15 minutes."  Gonzales Dep. Pt. 1, 86:6-10.

6        **F.**    **Plaintiff's Claims**

7        In connection with these events, Plaintiff sought to hold a number of officers as well as the

8  City accountable for violations of her constitutional rights and of state law.  Specifically, Plaintiff

9  asserted claims against the Defendant Officers under 42 U.S.C. §§ 1981, 1983, 1985, and 1986 for

10  violations of her Fourth Amendment right to be free from unreasonable search and seizure (Third

11  Cause of Action, or "COA").  Second Amended Compl. ("SAC") ¶¶ 117-40.  She also sought to

12  hold the City liable for these violations under *Monell v. Department of Social Services of the City*

13  *of New York*, 436 U.S. 658 (1978) (First COA) and to hold Detective Jimenez and Sergeant Archer

14  liable under § 1983 as supervisors (Second COA).  *Id.* ¶¶ 102-116.  Finally Plaintiff asserted a

15  bevy of derivative state law claims against Defendants including false arrest (Fourth COA), *id.* ¶¶

16  144-52; trespass (Fifth COA), *id.* ¶¶ 164-71; violation of California Civil Code § 52.1 ("Bane

17  Act") (Sixth COA), *id.* ¶¶ 172-78; conspiracy to violate civil rights and commit torts (Seventh

18  COA), *id.* ¶¶ 179-84; aiding and abetting violations of civil rights and commission of torts (Eighth

19  COA), *id.* ¶¶ 185-90; "injunctive relief" (Ninth COA), *id.* ¶¶ 191-96; and negligence (Tenth

20  COA), *id.* ¶¶ 197-206.  Plaintiff also asserted a claim for battery against Officer Sanchez only

21  (second "Fourth" COA).  *Id.* ¶¶ 153-63.

22        On May 15, 2015, the parties stipulated to dismiss all of Plaintiff's claims against Officers

23  Fries, Higgins, Pifferini, and Sanchez, Detective Jimenez, and former Chief Moore.  The parties

24  further stipulated to the dismissal of Plaintiff's *Monell* claim (First COA), her claims under 42

25  U.S.C. §§ 1981, 1985, and 1986 (Third COA), as well as her claims of civil conspiracy and aiding

26  and abetting (Seventh and Eighth COAs).  Accordingly, this order addresses only the remaining

27  claims against Sergeant Archer, Officer DeLa Cruz, and the City.

28

United States District Court
Northern District of California

8

1

**G.   Evidentiary Matters**

2        In connection with her motion, Plaintiff seeks judicial notice of five documents, Exhibits

3   A-E.  Pl.'s Request for Judicial Notice ("RJN"), ECF 145.  Defendants object to consideration of

4   Exhibit A to the Declaration of Marylou Gonzales, Exhibit J to the Declaration of Steven M. Berki

5   in Support of Plaintiff's Motion for Partial Summary Judgment, and Exhibits C and D of

6   Plaintiff's Request for Judicial Notice.  Defs.' Objections to Evidence ("Objections"), ECF 152.[2]

7   For each of those exhibits, Defendants contends that the exhibit is inadmissible hearsay under

8   Federal Rule of Evidence 802 and that Plaintiff has "failed to establish a foundation for

9   admissibility as evidence under Rules 1002 and 1007 of the Federal Rules of Evidence."[3]  *See*

10  Defs.' Objections 2-3.  Defendants also advanced separate evidentiary objections against

11  Plaintiff's RJN Exhibits A and B and Exhibit A to the Berki declaration in their Response to

12  Plaintiff's Separate Statement of Material Facts and Issues, which is an improper place to make

13  such objections.  *See* Defs.' Responsive Separate Statement 3-6, ECF 153.  The Court addresses

14  each piece of evidence below.

15       Plaintiff's RJN Exhibit A is a "Search Warrant and Declaration of Probable Cause dated

16  February 8, 2012" signed by Officer Davies in connection with the investigation into Robert

17  Cordova Jr.  RJN Exhibit B is a copy of an arrest warrant for Mary Gonzales signed October 10,

18  2011 and issued by the Superior Court of California for the County of Santa Clara.  A court may

19  judicially notice a fact "that is not subject to reasonable dispute" because it "can be accurately and

20  readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.

21

22   [2] The Court notes that Defendants' evidentiary objections were improperly filed separately from
     their opposition brief.  *See* Civ. L.R. 7-3(a) ("Any evidentiary and procedural objections to the
23   motion must be contained within the brief or memorandum.").  The error is excused, however,
     because the total page length of Defendants' brief combined with their separate evidentiary
24   objections does not exceed the page limit set in the local rules.

25   [3] Defendants also assert that Plaintiff failed to serve copies of these exhibits, which were originally
26   sought to be filed under seal, at the time that they were filed.  Defendants suffered no prejudice
     from Plaintiff's initial failure to serve these exhibits, however, as Plaintiff's counsel averred
27   during oral argument that they were subsequently provided to Defendants upon request.
     Moreover, the Court ordered the exhibits (or substantial portions thereof) unsealed.  See Order
28   Granting In Part Pl.'s Admin. Mot. to File Under Seal, ECF 150.  As such, this objection is
     OVERRULED.

United States District Court
Northern District of California

United States District Court
Northern District of California

201(b).  Defendants' objections to judicial noticeability and admissibility of these exhibits is

OVERRULED because they are matters of public record that are central to Plaintiff's claim, fall

within the public records exception to the rule against hearsay, Fed. R. Evid. 803(8), and

Defendants do not challenge the authenticity of these documents.  As such, Plaintiff's RJN is

GRANTED as to Exhibits A and B.  *See Gressett v. Contra Costa Cnty.*, No. C-12-3798 EMC,

2013 WL 2156278, at *5 (N.D. Cal. May 17, 2013).

Plaintiff's RJN Exhibit C is a copy of the booking report for Mary Martinez (aka, Mary

Gonzales and Maryann Gonzales) prepared by the Santa Cruz County Sheriff's Department on

November 21, 2014.  RJN Exhibit D is a copy of booking mugshots prepared by the Santa Clara

County Sheriff's Department on November 21, 2014, which shows "various mugshots" of Mary

Gonzales (aka, Maryann Gonzales and Virginia Gonzales).  Defendants' objections regarding

these exhibits are OVERRULED.  Exhibit C is not hearsay to the extent offered to show the

information available to Defendants on February 13, 2012 concerning the status of the Mary

Gonzales arrest warrant.  Exhibit D is not hearsay to the extent offered to show the mugshots of

Mary Gonzales available to Defendants on or before February 13, 2012.  Defendants moreover do

not appear to challenge the authentication provided by the custodian of records.  To the extent

Defendants' "foundation for admissibility" argument can be understood as a challenge to

Plaintiff's ability to establish that Defendants actually possessed the information in those

documents on the day in question, that is an issue of relevance, not admissibility.  Plaintiff's RJN

Exhibits C and D may thus be considered to the extent they are relevant to the issues before the

Court, and Plaintiff's RJN is GRANTED as such.

Plaintiff's RJN Exhibit E is a copy of the operative Second Amended Complaint ("SAC")

in this action.  While a court may take judicial notice of its own records and of other court

proceedings if they "directly relate to matters before the court," *Hayes v. Woodford*, 444 F. Supp.

2d 1127, 1136-37 (S.D. Cal. 2006), the court "will not take judicial notice of such documents for

the truth of the matter asserted therein," *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d

1052, 1067 (N.D. Cal. 2010).  *See also M/V Am. Queen v. San Diego Marine Const. Corp.*, 708

F.2d 1483, 1491 (9th Cir. 1983) (judicially noticeable court filings will not be used "so as to

1    supply, without formal introduction of evidence, facts essential to support a contention" in the

2    present case").  To the extent Plaintiff requests notice of the SAC as evidence of the facts alleged

3    therein, that request is DENIED.  For all other purposes, the request is unnecessary because the

4    SAC is the operative complaint in this action.

5         Gonzales Exhibit A is a copy of Plaintiff's redacted driver license, which is authenticated

6    by her declaration.  Decl. of Marylou Gonzales ¶ 3, ECF 146-2.  The license is hearsay to the

7    extent offered to establish Plaintiff's height, weight, and appearance on February 13, 2012, as

8    asserted in the license, but not hearsay to the extent offered to show the identifying information in

9    the Department of Motor Vehicle's records and available to Defendants on that day.  In any event,

10   Plaintiff testified to her height during her deposition.  Gonzales Dep. Pt. 1, 76:20.  As Defendants

11   do not contest the authenticity of the copy, their objection to Gonzales Exhibit A is

12   OVERRULED, and the document will be considered to the extent it is relevant and offered for

13   non-hearsay purposes.

14        Berki Exhibit A is a copy of a February 7, 2012 email from Officer DeLa Cruz to

15   Detective Jimenez that Defendants produced.  Berki Exhibit J is a copy of the 2012 "METRO Unit

16   Guidelines."  Both were produced by Defendants in this litigation, and both are attached to

17   Defendants' supplemental responses to Plaintiff's requests for production, in connection with

18   which the documents were produced.  These exhibits are not hearsay because they are not offered

19   for the truth of the matter asserted, nor can Defendants credibly challenge the authenticity of a

20   document that they produced.  Defendants' objections to Berki Exhibits A and J are accordingly

21   OVERRULED.

22   **II.    LEGAL STANDARD**

23        Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary

24   judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions

25   on file, together with the affidavits, if any, show that there is no genuine issue as to any material

26   fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v.*

27   *Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

28        The moving party seeking summary judgment "bears the burden of showing there is no

United States District Court
Northern District of California

11

material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact," *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). A material fact is one that could affect the outcome of suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied this initial burden, the non-moving party must then "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Schneider v. TRW, Inc.*, 938 F.3d 986, 991 (9th Cir. 1990). It is not the duty of the district court to "to scour the record in search of a genuine issue of triable fact." *Keenan*, 91 F.3d at 1279 (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). Moreover, the court makes no credibility determinations and does not weigh the evidence. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009). "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III. DISCUSSION

Plaintiff seeks partial summary judgment against Sergeant Archer and Officer DeLa Cruz on her § 1983 claims for unlawful arrest and search of her home, as well as her claims against both under California's Bane Act, Cal. Civ. Code § 52.1. Plaintiff also seeks partial summary judgment on her claim that Sergeant Archer is liable as a supervisor under § 1983 for the constitutional violations of his subordinates. Pl.'s Mot. 4, ECF 146. Defendants seek summary judgment on all of Plaintiff's claims on the ground that no constitutional violation occurred on the

United States District Court
Northern District of California

1    day in question.  *See* Defs.' Mot., ECF 140.

2        **A.    Section 1983 Claims Against Archer and DeLa Cruz (Third COA)**

3        Plaintiff asserts that Archer and DeLa Cruz violated her Fourth Amendment right to be free

4    from unreasonable seizure because they could not reasonably have mistaken her for Maryann

5    when they arrested her pursuant to the warrant for Maryann.  Pl.'s Mot. 12.  Because she contends

6    that the arrest was unlawful, Plaintiff also asserts that the sweep of her house was unreasonable

7    under the Fourth Amendment and that the officers utilized excessive force in the process.[4]  *Id.* at 8,

8    13-15; Pl.'s Opp. 11, ECF 158.  This case hinges on the legality of the arrest.[5]

9        If Plaintiff's arrest was lawful, then it is unlikely that she can prevail on her claims of

10   unreasonable search and excessive force.  A protective sweep incident to a lawful arrest is

11   permissible to assure officer safety if based upon "articulable facts which, taken together with the

12   rational inferences from those facts, would warrant a reasonably prudent officer in believing that

13   the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland*

14   *v. Buie*, 494 U.S. 325, 334 (1990).  The "remote possibility" of Cordova's presence in the house

15   based upon the previously unreported presence of his car in front of the house was such an

16   articulable fact.  DeLa Cruz Dep. Pt. 2, 219:6-18; *see United States v. Castillo*, 866 F.2d 1071,

17   1080-81 (9th Cir. 1988).  Moreover, the officers' 30-second sweep appears to have been no more

18   intrusive than a "cursory inspection of those spaces where a person may be found" so as to dispel

19   the suspicion of danger.  *Buie*, 494 U.S. at 335-36.  Contrary to Plaintiff's repeated assertion, there

20   is no evidence in the record that the officers searched her children's backpacks, and she offers no

21   evidence of her own on this point.  *See* Pl.'s Opp. 5, 10 (citing "Berki Dec. B, Archer, pg. 149:6 to

22   149:10; Ex. C, De La Cruz, pg. 127:22 to 128:9, pgs. 218:15 to 219:18; Berki Dec. Ex. G, Ruelas,

23

24   [4] Plaintiff also asserts that neither a "knock and talk" procedure nor entry to locate Plaintiff's son
     constitutes sufficient justification to enter her home.  Pl.'s Mot. 8-10.  Defendants contend, and the
25   Court agrees, that these arguments are irrelevant to the central issue in dispute: whether Plaintiff's
     arrest under the warrant for Maryann was lawful.  Defs.' Opp. 10-12.

26   [5] The "arrest" in this case was more akin to a detention, as Plaintiff was in handcuffs for at most
27   ten or fifteen minutes, was never taken into custody or booked, and was released immediately after
     Archer and DeLa Cruz realized their mistake.  It is undisputed, however, that the officers at the
28   door claimed to be executing an arrest warrant and, as such, the Court assumes for purposes of the
     present motions that Plaintiff was arrested on February 13, 2012.

United States District Court
Northern District of California

pgs. 34:2 to 34:23").  Likewise, some measure of force is authorized to carry out an arrest pursuant to a facially valid felony warrant, and there is no evidence that the officers employed more force than was necessary.[6]  *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968).  The outcome changes, however, if the arrest was not lawful, because then no protective sweep would be justified and no use of force would be authorized.

Turning to the arrest, the legality of which is the subject of both parties' overlapping motions for summary judgment, Defendants argue that Archer and DeLa Cruz made an objectively reasonable mistake in identifying Plaintiff as Maryann.  Because, under established law, an officer has probable cause to arrest someone he reasonably believes to be the subject of a facially valid arrest warrant, Defendants argue that Plaintiff's arrest pursuant to the warrant for Maryann was reasonable—and therefore lawful—under the circumstances.  Defs.' Mot. 8, ECF 151; Defs.' Opp. 4-10, ECF 140; Defs.' Reply 2-4, ECF 165.  Plaintiff in her moving papers argues that the mistake was objectively unreasonable because of the physical differences between her and Maryann, and because the officers "relied solely on a mugshot image of the suspect and general characteristics in comparison to Ms. Gonzales – Hispanic, female, approximately 200 lbs," without conducting further investigation into the warrant.[7]  Pl.'s Mot. 11-12.  Moreover, in opposing Defendants'

---

[6] Plaintiff testified that the officers removed her handcuffs as soon as they discovered they had arrested the wrong woman.  Gonzales Dep. Pt. 1, 86:13-15; Ruelas Dep. Pt. 1, 42:9-11.  Although she later testified that she recalls the handcuffs being tight, *see* Kallis Decl. Exh. E (Gonzales Dep. Pt. 2) 92:10-15, there is no evidence that she ever communicated this discomfort to the officers.  *See Hupp v. City of Walnut Creek*, 389 F. Supp. 2d 1229, 1232 (N.D. Cal. 2005) ("[i]n cases where the Ninth Circuit has held that excessively tight handcuffing can constitute a Fourth Amendment violation, plaintiffs either were demonstrably injured by the handcuffs or their complaints about the handcuffs being too tight were ignored by the officers"); *Hartmann v. Hanson*, No. C 09-03227 WHA, 2010 WL 335677, at *9-11 (N.D. Cal. Jan. 22, 2010).  Finally, while there is evidence that some of the officers had their weapons drawn, there is no evidence that any of them pointed their gun at Plaintiff.  *Compare Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002) ("use of a drawn gun pointed at [unarmed plaintiff's] head from close range" constituted excessive force under the circumstances).

[7] Plaintiff also asserts that had the officers checked other databases for information about Maryann, they would have discovered that Maryann was already in custody on February 13, 2012.  Pl.'s Mot. 11-12.  This fact is immaterial to the issue of objective reasonableness because the officers did not check other databases, nor were they required to.  The Court notes only the evidence Plaintiff proffered to establish that Maryann was in custody on February 13, 2012 is actually perplexingly inconsistent.  Plaintiff requested judicial notice of an arrest warrant for "Mary Gonzales" signed October 10, 2011 and issued in Santa Clara, as well as booking information from the Santa Cruz County Sheriff's Department purportedly showing that "the

14

United States District Court
Northern District of California

1   motion, Plaintiff asserts that the officers used the warrant for Maryann as a ruse to enter her house

2   in order to search for her son.  Pl.'s Opp. 7-8.

3       It is well established that if "the police have probable cause to arrest one party, and [if]

4   they reasonably mistake a second party for the first party, then the arrest of the second party is a

5   valid arrest." *Hill v. California*, 401 U.S. 797, 802 (1971).  "In such cases, the question is whether

6   the arresting officers had a good faith, reasonable belief that the arrestee was the subject of the

7   warrant."  *Rivera v. Cnty. of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014).  When examining the

8   reasonableness of a mistake of identity, "sufficient probability, not certainty, is the touchstone of

9   reasonableness under the Fourth Amendment."  *Hill*, 401 U.S. at 804.  The mistake must truly be a

10  mistake, however, as it is equally well established that *knowingly* arresting the wrong person

11  pursuant to a facially valid warrant the officer knows was issued for someone else is a violation of

12  the Fourth Amendment.  *Lee v. Gregory*, 363 F.3d 931, 935-36 (9th Cir. 2004).

13      Defendants in their motion focus solely on objective reasonableness divorced from the

14  context in which the mistake was made.  Certainly, in the abstract, the officers' mistake of identity

15  could be objectively reasonable in light of Plaintiff's and Maryann's similarities in age, height,

16  and weight, the presence of the Toyota Camry in the driveway (the "nexus," as Officer Ruelas

17  described it), and the observation of a mark or mole on Plaintiff's face that caused the officers to

18  conclude that she was Maryann.  Archer Dep. Pt. 1, 126:12-22, 144:22-145:7, 149:1-4; DeLa Cruz

19  Dep. Pt. 1, 125:11-126:1, 132:6-18, 191:14-25; DeLa Cruz Dep. Pt. 3, 194:8-25; Ruelas Dep. Pt.

20  1, 46:21-47:2; *see United States v. Allen*, 235 F.3d 482, 488 (10th Cir. 2000); *but see Gant v.*

21  *County of Los Angeles*, 765 F. Supp. 2d 1238, 1251 (C.D. Cal. 2011), *aff'd in part, rev'd in part*

22  *on other grounds*, 772 F.3d 608 (9th Cir. 2014) (finding 7-inch height and 120-pound weight

23  difference "drastic" but collecting cases and acknowledging that 1 to 2-inch height and 10 to 20-

24  pound weight difference was routinely found to be objectively reasonable).  Moreover, the officers

25  were entitled to rely upon a facially valid arrest warrant and were under no legal obligation to

26

27  warrant suspect was already incarcerated with the California Department of Corrections four (4)
    months earlier on *October 5, 2011*."  Pl.'s Opp. 3 (emphasis added); Pl.'s RJN Exhs. B, C.  There

28  is no clear explanation as to why there would be a warrant for Maryann's arrest signed in Santa
    Clara County five days after her purported incarceration in Santa Cruz County.

1    conduct further investigation on the warrant or to verify Plaintiff's identity before arresting her.

2    *See Blackwell v. Barton*, 34 F.3d 298, 304 (5th Cir. 1994); *accord Moore v. McMullen*, 152 F.3d

3    927 (9th Cir. 1998) (unpublished table decision) (citing *Blackwell* for proposition that "[i]t matters

4    not whether a reasonable officer would have conducted a background check on [the plaintiff] prior

5    to arrest, only whether a reasonable officer could have believed that [the plaintiff] was [the subject

6    of the arrest warrant]."); *Garcia v. Cnty. of Tulare*, No. 1:08CV 0940AWISMS, 2010 WL 424405,

7    at *11 (E.D. Cal. Jan. 27, 2010).  Yet "it is a matter of common sense that a combination of events

8    each of which is mundane when viewed in isolation may paint an alarming picture."  *Ryburn v.*

9    *Huff*, 132 S. Ct. 987, 991 (2012) (per curiam).

10           Plaintiff's version of events advances the assertion, based upon the totality of evidence,

11   that Archer and DeLa Cruz *knew* she was not Maryann but executed the arrest warrant anyway as

12   a ruse or "subterfuge" to gain entry into her house in order to search for her son.  Pl.'s Opp. 7, 9,

13   22.  Although not relied upon by Plaintiff, her argument echoes the circumstances of *Lee v.*

14   *Gregory*.  There, the plaintiff—Julian—sued a special agent with the Federal Bureau of

15   Investigation ("FBI"), alleging that the agent had ordered his arrest pursuant to a warrant in

16   Florida knowing "that Julian was not the man sought by the Florida warrant, but arrest[ing] him

17   anyway in order to obtain information about [Julian's brother] Robert."  363 F.3d at 934.  There

18   was evidence in the record that the FBI believed Robert was living under the alias "Christopher

19   Lee" using Julian's social security number and birthdate, and that the agent was aware of the

20   differences in the brothers' physical appearance.  Nevertheless, the FBI agent asked local

21   authorities to arrest Julian pursuant to a Florida warrant for "Christopher Lee" shortly after Julian

22   had rebuffed the agent's attempt to interview him about his brother's whereabouts.  *Id.*  The

23   district court found a genuine issue of material fact as to whether, in light of these facts and

24   circumstances, the agent "actually knew that the warrant did not apply to Julian."  *Id.* at 935.  The

25   Ninth Circuit affirmed, concluding that knowingly arresting the wrong person pursuant to a

26   facially valid warrant is not only a violation of the Fourth Amendment but a self-evident and

27   clearly established wrong precluding qualified immunity.  *Id.* at 935-36.

28           Here, Plaintiff points to conflicting testimony regarding the reason for Metro Team 1's

16

presence at 425 Matthews Court ranging from a simple "knock and talk" to finding Cordova, the number of officers that they brought ostensibly for a knock and talk, and Officer DeLa Cruz's statement to Plaintiff about "'the real reason why we're here'" as evidence that the police went to Plaintiff's house not to make contact with her but rather to search for her son, who had by then been at large for over a week. Pl.'s Opp. 7-8. Specifically, Officer Pifferini and Sergeant Davies testified that Metro Team 1 went to 425 Matthews Court to locate Cordova, in contrast to Officer DeLa Cruz's repeated testimony that the team's purpose was to identify witnesses and bring them back to the police station. Pifferini Dep. Pt. 2, 13:7-9; Davies Dep., 49:9-16; DeLa Cruz Dep. Pt. 1, 143:2-15. It is undisputed that there were at least six officers present, with Officers Fries and Pifferini assigned to observe the exterior of the house, and potentially another team present on the "outer perimeter." Pifferini Dep. Pt. 1, 15:11-23; Fries Dep. Pt. 3, 79:5-11; Archer Dep. Pt. 1, 112:8-10, 113:4-8. After DeLa Cruz determined that Plaintiff was not Maryann, she stated: "'Let me tell you the real reason why we're here.' She said, 'There's been a homicide. And somebody that address comes back here may be involved or may know something about this.'" Gonzales Dep. Pt. 1, 82:24-83:2. Each of these facts, when taken in isolation, could have an innocuous explanation. When viewed together with all reasonable inferences drawn in Plaintiff's favor, however, a reasonable juror could infer that Archer and DeLa Cruz's actual purpose was to enter Plaintiff's house to search for Cordova and that they therefore knew she was not Maryann when they executed the arrest warrant. If such is the case, then the arrest, protective sweep, and use of force were unlawful, and Archer and DeLa Cruz would not be entitled to qualified immunity for those violations. *Lee*, 363 F.3d at 935-36.

To be sure, there is some evidence from Plaintiff's own testimony to suggest that the officers genuinely mistook her for Maryann including, among other things, their continuing insistence that Plaintiff was Maryann even after comparing her face with the picture of Maryann, as well as their observation of a mark or mole on Plaintiff's face that they later realized was on the wrong side of the face. *See* Gonzales Dep. Pt. 1, 74:6-12, 77:22-78:4, 79:24-80:8, 82:2-6, 83:10-12, 95:8-9; *see also* DeLa Cruz Dep. Pt. 1, 128:1-2; Archer Dep. Pt. 1, 147:2-3. However, on summary judgment, the Court does not weigh evidence or determine credibility. There is some

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1  probative evidence in the record that, when rendering all reasonable inferences in Plaintiff's favor,

2  could lead a reasonable juror to conclude that Archer and DeLa Cruz knew that Plaintiff was not

3  Maryann.  Because of this genuine dispute of material fact, Plaintiff's Motion for Partial Summary

4  Judgment must be DENIED, as must Defendants' Motion for Summary Judgment with respect to

5  the § 1983 claims of unreasonable search and seizure and excessive force against Archer and

6  DeLa Cruz.

7  **B.  Section 1983 Claim Against Sergeant Archer as Supervisor (Second COA)**

8  There does not appear to be any genuine dispute that Sergeant Archer would be liable as a

9  supervisor if the underlying search and sweep is determined to be unconstitutional.  *See* Defs.'

10  Mot. 11-12 (acknowledging that "[t]he evidence establishes Sgt. Archer supervised the operation"

11  but arguing that there is no supervisory liability because there was no underlying constitutional

12  violation).  Because there is a genuine issue of material fact surrounding the legality of the arrest

13  and search, Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for

14  Summary Judgment must both be DENIED with respect to the supervisory liability claim against

15  Archer (Second COA).

16  **C.  State Law Claims Against Archer, DeLa Cruz, and the City (Fourth, Fifth, Sixth,**
    **Seventh, Tenth COAs)**

17

18  Plaintiff's remaining state law claims against Archer and DeLa Cruz include false arrest

19  (Fourth COA), trespass (Fifth COA), violation of the Bane Act (Sixth COA), and negligence

20  (Tenth COA).  Plaintiff also asserts a Bane Act claim against the City (Sixth COA), and it is not

21  clear whether she seeks to hold the City liable for the other alleged state tort claims.  All of these

22  claims depend on the existence of underlying constitutional violations.  *See* Defs.' Mot. 14-21.

23  Specifically with respect to the false arrest claim and the Bane Act claim, Archer's and

24  DeLa Cruz's (as well as the City's) ability to invoke state law immunities depends on whether the

25  underlying arrest was reasonable within the contemplation of the Fourth Amendment.  *Rivera*, 745

26  F.3d at 393.  Likewise, "[t]he essence of the cause of action for trespass is an 'unauthorized entry'

27  onto the land of another," *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th

28  1004, 1042, (2009) (quoting *Civic Western Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 16

United States District Court
Northern District of California

(1977)) (internal quotation marks omitted), and the officers' intrusion into Plaintiff's house was unauthorized if the underlying arrest was unlawful.  Because there are genuine disputes of material fact with respect to the lawfulness of Plaintiff's arrest under the warrant for Maryann Gonzales, those disputes infect the state law claims as well.  Plaintiff's Motion for Partial Summary Judgment is therefore DENIED with respect to the Sixth (COA), and Defendants' Motion for Summary Judgment is likewise DENIED with respect to the Fourth (false arrest), Fifth (trespass), Sixth (Bane Act), and Tenth (Negligence) COAs.

### D.   Injunctive Relief (Ninth COA)

Defendants assert that Plaintiff does not have standing to pursue injunctive relief.  Defs.' Mot. 21.  The Court agrees that *Los Angeles v. Lyons*, 461 U.S. 95 (1983), precludes Plaintiff from obtaining injunctive relief because she has not demonstrated—nor can she demonstrate—a "real or immediate threat" that she "will be wronged again—a likelihood of substantial and immediate irreparable injury." *Id.* at 111 (internal quotation marks and citation omitted).  Defendants' Motion for Summary Judgment is accordingly GRANTED with respect to Plaintiff's claim for injunctive relief (Ninth COA).

## IV.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.   Plaintiff's Motion for Partial Summary Judgment is DENIED;

2.   Defendants' Motion for Summary Judgment is GRANTED on the Ninth COA (injunctive relief);

3.   Defendants' Motion for Summary Judgment is DENIED on the remainder.

**IT IS SO ORDERED.**

Dated: May 19, 2015

BETH LABSON FREEMAN
United States District Judge